STATE OF NORTH CAROLINA v. GERALD WALTER JONES AND WILLIE KATE JONES

No. 8628SC583

(Filed 7 April 1987)

1. **Constitutional Law § 30; Bills of Discovery § 6— records of telephone calls not disclosed to defendant—not examined in camera or sealed—error**

   In a prosecution arising from the purchase of hydromorphone from defendants in which an electronic device had been placed on defendant Willie Kate Jones' telephone to record the exact time and duration of each call and the telephone number of either outgoing calls only or of all calls, the trial court erred by failing to examine the records *in camera* or seal them for appellate review.

2. **Criminal Law § 54; Constitutional Law § 30— further access to drugs for testing by defense expert—denied—no error**

   The trial court did not err in a prosecution arising from the sale of hydromorphone by finding that the defense had violated a court order which allowed access to the seized substances for the purpose of conducting an independent analysis and in denying the defense further access to the drugs where defendants had two months between the time of the order and the date of the trial to engage a chemist and set up a meeting; the confusion around the test could probably have been avoided if defendants had not sat so long on their right to have an expert examine the drugs; there was ample evidence that defendants' chemist never intended to conduct an independent analysis of the drugs and did not avail himself of the opportunity to do so that evening; and defendants' theory of the inaccuracy of the State's test was adequately brought out during cross-examination. N.C.G.S. § 15A-903.

3. **Criminal Law § 109— SBI chemist misappropriating drugs—defendants' motion to dismiss and for instructions—denied**

   In a prosecution arising from the sale of Dilaudid where it was discovered a few months before trial that an SBI chemist had taken some $300,000 worth of drugs from the SBI lab where the drugs in this case were tested, the court did not err by failing to dismiss the indictments because the State refused to grant the chemist immunity in order to testify, and by failing to instruct the jury that the testimony of a missing or absent witness who is peculiarly within the State's power to produce would have been unfavorable to the State's case.

State v. Jones

4. **Narcotics § 4— trafficking in hydromorphone—no measurement of actual percentage of hydromorphone—evidence sufficient**

Defendant was properly convicted of trafficking in hydromorphone on the basis of possession and attempted sale of 816 tablets of Dilaudid weighing a total of 73.5 grams where there was no measurement of the percentage of hydromorphone present in the tablets. The legislature's use of "opium or opium derivative or any mixture containing such substance" in N.C.G.S. § 90-95(h)(4) establishes that the total weight of the dosage units is sufficient to charge a suspect with trafficking.

5. **Grand Jury § 2— challenge to sufficiency of evidence—evidence secret**

The trial judge did not err in a prosecution arising from the sale of Dilaudid tablets by denying defendant Gerald Jones' motion to dismiss one of the sale and delivery indictments because the lab report was not prepared until after the grand jury convened. The nature and character of the evidence presented to the grand jury is secret. N.C.G.S. § 15A-623(e).

APPEAL by defendants from *Stephens, Judge*. Judgment entered 10 September 1985 in BUNCOMBE County Superior Court. Heard in the Court of Appeals 2 February 1987.

On 7 May 1985, defendant Gerald Walter Jones was indicted on charges of six counts of sale and delivery of hydromorphone (Dilaudid), six counts of possession with intent to sell and deliver, and one count of conspiracy to sell and deliver. He was also charged with trafficking in hydromorphone by sale, by delivery, by possession and by transporting; in addition, he was charged with conspiracy to traffic in hydromorphone. Each of the five trafficking charges alleged an amount in excess of 28 grams.

Gerald Jones' mother, Willie Kate Jones, was indicted on that same date on five counts of sale and delivery of hydromorphone, five counts of possession with intent to sell and deliver, one count of conspiracy to sell and deliver, and one count of conspiracy to traffic. Both defendants pleaded not guilty, and their cases were joined for trial.

Testimony by the State's principal witness, Special Agent Rick Whisenhunt of the S.B.I., tended to show the following events and circumstances. In October 1984, Whisenhunt began an undercover operation to try to purchase drugs from defendants. On 18 October 1984, Whisenhunt—using the name "Jack"—telephoned Willie Kate Jones at her residence and asked if she had any Dilaudid for sale. She did, and over the next couple of days, they made arrangements by telephone for the sale. On 20 Octo-

ber, Whisenhunt came to Willie Kate's house on Montford Avenue where she introduced him to a woman named Paula. Whisenhunt gave Paula $400 for 20 tablets of Dilaudid and also gave Willie Kate some money for acting as middleman.

The next day, Willie Kate called "Jack" on his undercover telephone line to arrange a sale of 200 tablets; Agent Ramsey, who was monitoring the line, had Whisenhunt call her back. On 22 October, Whisenhunt went to Willie Kate's house and purchased 50 Dilaudid for $1,250 and 20 milliliters of liquid Dilaudid for $350. On 18 November, pursuant to a series of calls back and forth between them, Willie Kate and Whisenhunt agreed to meet at a gas station; the agent bought 75 Dilaudid for $1,875. On 11 December, Whisenhunt again met Willie Kate in order to buy some Dilaudid. This time, however, the meeting took place in a parking lot, and she was accompanied by her son, defendant Gerald Jones, and her stepson Mark. Whisenhunt gave Gerald $4,000 in return for 100 Dilaudid.

After more negotiations by telephone, Whisenhunt met Willie Kate and Gerald at the K-Mart Plaza on 19 December. Willie Kate suggested that, since her granddaughter was in the car, that the actual transaction take place somewhere else. Whisenhunt met Gerald in the men's room of the Burger King and bought 25 pills for $1,125. Back at the car, Willie Kate indicated that she had more drugs to sell.

On 11 January, after another round of negotiations by telephone, Gerald went by the house where Willie Kate, and now Gerald, lived. The exchange took place between Whisenhunt and Gerald, although Willie Kate was present. Whisenhunt bought 25 tablets for $1,125. The three discussed future transactions.

Whisenhunt called the Jones residence a number of times over the next few weeks. A bigger deal of perhaps 300 pills was discussed, but Gerald had only 165 on hand. On 2 March, the two men met in the parking lot of a restaurant in Asheville where Whisenhunt purchased 25 Dilaudid for $1,125. On 21 March, after another meeting had fallen through, Whisenhunt met Gerald and bought 100 pills from him for $4,000. Gerald mentioned that he could get together 500 pills and that Whisenhunt should start arranging financing.

Over the next few weeks, Agent Whisenhunt spoke with Willie Kate and Gerald about the deal for 500 pills. Gerald discovered that his connection could bring 1,000 pills to Asheville, and negotiations began on the price. On 19 April, Whisenhunt called Willie Kate and told her he had to talk to her but not on the phone. She invited him to the house, where he showed her $30,000 which he had gotten from his "money man" to put on the deal. Willie Kate said she could only wait by the phone for the connection to call—she had no way of contacting him. However, the connection did not deliver the pills until a week later. Whisenhunt asked to be shown the pills; he said he wanted to make sure the Joneses were going to hold up their end of the bargain. On Tuesday, 30 April, the agent went to the Jones residence where Gerald showed him two brown pharmaceutical bottles containing the pills. Whisenhunt was caught off guard; he had not expected all 1,000 pills to be ready at that time. He told Gerald it would take some time to find his "money man"; Gerald agreed to hold 900 pills for him—Gerald needed money and planned to sell 100 himself. On Wednesday, 1 May, Gerald and Whisenhunt agreed to meet in the parking lot of the Waffle House at noon. The two met as planned, and when the agent gave the signal, Gerald was arrested by surveillance officers. Whisenhunt seized the two brown pharmaceutical bottles, which were eventually found to contain only 816 Dilaudid.

Senior Special Agent Ramsey of the S.B.I. testified that he had received 16 calls directed to Agent Whisenhunt. He gave exact dates and times for each call. Ralph Johanson, an S.B.I. chemist, testified for the State that the substances submitted to him in this case were Dilaudid tablets containing hydromorphone, and that the bulk weight of the tablets seized on 1 May was 73.5 grams. On cross-examination, Agent Johanson stated that he had not analyzed the tablets using mass spectrometry; he used an ultraviolet scan and two thin-layer chromatography tests. Agent Johanson testified that, although none of the tests he had performed was sufficient alone to establish the presence of hydromorphone, he believed that the collective results were sufficient to establish the presence of hydromorphone.

Neither defendant presented evidence. The trial court dismissed the charges of trafficking by sale and trafficking by delivery against defendant Gerald Jones. The jury returned a verdict

of guilty against Mr. Jones on five counts of sale and delivery of hydromorphone, five counts of possession with intent to sell and deliver, conspiracy to traffic, and trafficking by transporting and trafficking by possessing, all in an amount in excess of 28 grams. Defendant Willie Kate Jones was found guilty on all counts as charged.

From judgments of imprisonment entered on the verdicts, defendants appealed.

*Attorney General Lacy H. Thornburg, by John H. Watters, Assistant Attorney General, and Ellen B. Scouten, Assistant Attorney General, for the State.*

*Bob Warren for defendant-appellant Gerald Walter Jones.*

*Appellate Defender Malcolm Ray Hunter, Jr., by David W. Dorey, Assistant Appellate Defender, for defendant-appellant Willie Kate Jones.*

WELLS, Judge.

*Willie Kate Jones' Appeal*

[1] Defendant's first assignment of error concerns an electronic device placed surreptitiously on her telephone. According to uncontroverted testimony received on *voir dire*, this device — called a PEN register — records the exact time and duration of each incoming and outgoing call; however, there is some contradictory evidence as to whether the telephone number of the other party is recorded for all calls or only for outgoing calls. Before trial, defendant made a motion for discovery of "mechanical or electronic recordings" as provided in N.C. Gen. Stat. § 15A-903(d); Superior Court Judge Charles Lamm later ordered the prosecution to comply with defendant's discovery requests. Despite the motion and subsequent order, the State did not disclose any evidence of the PEN register until well into the trial. Agent Whisenhunt had already testified that no surreptitious recordings existed; Agent Ramsey admitted the use of a PEN register when co-counsel questioned him using the phrase "electronic surveillance" rather than "recording device." During the subsequent *voir dire*, Agent Whisenhunt again took the stand. He testified that the register was installed on 25 February 1985 pursuant to a

court order based on his own affidavit prepared with the help of Mr. Brown, the district attorney prosecuting defendant's case. The register was removed approximately a week after defendant's arrest.

Defendant requested the witness to show him a copy of the printout, but an objection by the State was sustained. Defendant then made a motion to dismiss on the ground that the State had violated the order of discovery since the PEN register printout constituted a "recording" under the meaning of G.S. § 15A-903(d). Counsel argued that the register was directly relevant to his defense of trying to discredit the agents' testimony. The trial court denied the motion and held — without ever examining the printout — that no relevant evidence had been withheld and that defendant's rights had not been violated. The court added that defendants could call witnesses or present any records to the jury; defendants had asked to subpoena the appropriate people at Southern Bell. The following exchange then took place between the trial court and both defendants' counsel:

MR. WARREN: Well, Your Honor, as a clarification of that Order, would you allow defense counsel time to talk with the witness before the counsel makes the decision to put that witness on the stand? Obviously, if we don't have the information — The reason, Your Honor, I want to point out why it might be relevant is this records the exact times. Throughout this over a hundred pages of discovery material that we've had, the agents have recorded exact times, 5:03, 5:45. If, in fact, the PIN [sic] Registers show something different or if, in fact, they show that there were calls coming in at times there were no calls —

COURT: Yes, sir, that was my main concern that I addressed to Mr. Brown a few moments ago, and I will permit you to call any witness and ask that witness any question you choose to, inspect any records that that witness has to establish before this jury what you wish to choose to establish.

MR. WARREN: But, Your Honor, the basic due process right to elect a defense is then totally destroyed because if I don't know what the witness is going to say, the first rule in the world that you don't want to do is call a witness that you don't know what they are going to say.

COURT: Well, then, that will be a tactical decision on your part, counsel.

MR. BELSER: Why won't the Court examine it in camera, like *State v. Hardy* requires you to do?

COURT: *State versus Hardy* requires me to examine those items of evidence that I deem that could have some exculpatory value and be materially favorable to the defendant. I have heard no evidence at all that these items fit into that category; therefore, your request is denied.

MR. BELSER: And we can't give you that evidence.

COURT: I don't have to explain to you why I will or will not do anything, but I am giving you the courtesy of telling you that. Your request is denied.

MR. BELSER: Could we call that witness in a pretrial discovery motion?

COURT: No, sir, you may not. That request is denied.

MR. BELSER: I would move for a mistrial based on violation of the discovery statutes, Your Honor.

MR. WARREN: I would, also.

COURT: Your request is denied. Anything further?

Defendant contends that the trial court erred in refusing to grant her motion for mistrial based on the State's failure to inform defendant about the existence of the PEN register despite defendant's discovery motion and the subsequent court order enforcing that motion. Defendant also cites as error the court's refusal to examine *in camera* the PEN records and seal them for appellate review. We address the latter issue first.

In *Brady v. Maryland*, 373 U.S. 83, 10 L.Ed. 2d 215, 83 S.Ct. 1194 (1963), the United States Supreme Court held that due process requires the prosecution to disclose, upon request, evidence which is material and favorable to the defense. The Supreme Court further refined this holding in *U.S. v. Agurs*, 427 U.S. 97, 49 L.Ed. 2d 342, 96 S.Ct. 2392 (1976). The Court found that due process is concerned with the effect which suppressed evidence might have on the outcome of the trial rather than with aiding

State v. Jones

the defense in preparation of its case; therefore, the court reasoned, the prosecutor is constitutionally required to reveal the evidence only at trial. Such a requirement is conditioned upon a specific request by the defense. *Id.*

In the case at bar, the State contends that, as the trial court noted, the defense has made no showing that the evidence is material and favorable and thus defendant is not entitled to disclosure of the evidence. However, in *State v. Hardy*, 293 N.C. 105, 235 S.E. 2d 828 (1977), our Supreme Court held that,

> . . . since realistically a defendant cannot know if a statement of a material State's witness covering the matters testified to at trial would be material and favorable to his defense, *Brady* and *Agurs* required the judge to, at a minimum, order an *in camera* inspection and make appropriate findings of fact. As an additional measure, if the judge, after the *in camera* examination, rules against the defendant on his motion, the judge should order the sealed statement placed in the record for appellate review.

In the case at bar, the trial court erred in failing to examine the records *in camera* or seal them for our inspection. Such error leaves us unable to determine whether the court should have allowed defendant access to the records; we have before us neither findings of fact by the court nor the records themselves. Nor was the evidence otherwise received into the record. The trial court's refusal to allow defendant to interview the Southern Bell witness before putting him on the stand effectively precluded presentation of his testimony. Since the evidence could well be exculpatory, we are unable to say as a matter of law that the court's error was harmless beyond a reasonable doubt. We therefore grant defendant Willie Kate Jones a new trial as to the charge of conspiracy to traffic in hydromorphone, which is the only conviction based on the two agents' testimony as to telephone conversations with the defendant during the time in which the PEN register was operating.

[2] Of defendant's remaining assignments of error, we need address only one: her contention that the court committed reversible error in finding that the defense violated the court order which allowed them access to the seized substances for the pur-

pose of conducting an independent analysis and in denying the defense further access to the drugs. We disagree.

Two months before the date of the trial, Judge Lamm ordered that defendant Gerald Jones be allowed to hire an expert to test the drugs in this case, as long as the proposed procedure for obtaining and returning the drugs be submitted for approval. Defendant Willie Kate Jones was later allowed to join in this motion. Defendants made no arrangements to have an expert review the substances until 3 September, the date the case was called for trial. The court ordered that defendants' chemist be allowed to conduct tests of the drugs late that afternoon. The S.B.I. chemist and Agent Whisenhunt as well as two other officers met defendants' chemist, William Butler, at the S.B.I. lab a little after 6:00 p.m. Mr. Butler performed no tests on the drugs. During a hearing on the matter the next day, the State presented evidence that defendants' chemist had no intention of actually performing an independent analysis but merely wanted to track the tests used by the S.B.I. chemist in order to later impeach his testimony. The State's witness testified that, although the resources of the lab were available to Mr. Butler, he performed no tests, choosing instead to spend his time questioning the State's chemist about his methods. The defense contended that Mr. Butler performed no tests because he was waiting for Mr. Warren, defendant Gerald Jones' attorney, to arrive with some substances necessary for the test, and that when Mr. Warren arrived, the agents had already left with the evidence. The trial court entered an order finding that Judge Lamm's order "contemplated an entirely separate and independent analysis of the controlled substances" and that defendants sought only to review the procedures followed by the S.B.I. chemist, thus failing to comply with the order. The court further noted that counsel did not act in a timely manner in obtaining the services of a chemist and thus might have avoided the resulting confusion. For these reasons the court denied defendants' request to allow their expert further access to the drugs. The court, however, was incorrect in the interpretation of Judge Lamm's order; it in no way specified that only an independent analysis would be allowed. We therefore consider whether the court was otherwise justified in denying defendants further access to the seized substances.

N.C. Gen. Stat. § 15A-903(e) provides in part that:

. . . Upon motion of a defendant, the court must order the prosecutor to permit the defendant to inspect, examine, and test, subject to appropriate safeguards, any physical evidence, or a sample of it, available to the prosecutor if the State intends to offer the evidence, or tests or experiments made in connection with the evidence, as an exhibit or evidence in the case.

This provision replaced G.S. § 15-155.4 and § 15-155.5 which, although similar to the current statute, were more liberal in that they also allowed the defendant to interview prospective expert witnesses. *See* Official Commentary to G.S. § 15A-903. Since G.S. § 15A-903(e) does not on its face specify what type of testing procedures must be allowed, we must resolve the question by reference to due process principles. *See State v. McDougald*, 38 N.C. App. 244, 248 S.E. 2d 72 (1978), *appeal dismissed*, 296 N.C. 413, 251 S.E. 2d 472 (1979). As our own courts have not yet addressed the question of to what extent due process requires that defendants be allowed to conduct tests on seized substances, we turn for guidance to decisions of the federal courts which address the issue.

Although the Federal Rule of Criminal Procedure which provides for access to tangible objects is more general than our rule, *see* F. R. Crim. P. 16(a)(1)(c), courts considering the question of access have held that fundamental fairness and due process require that a defendant be allowed the opportunity "to have an expert of his choosing, bound by appropriate safeguards imposed by the Court, examine a piece of critical evidence whose nature is subject to varying expert opinion." *Barnard v. Henderson*, 514 F. 2d 744 (5th Cir. 1975). This fundamental requirement has been held in drug cases to be essentially the right of the accused to have an independent chemical analysis performed upon the seized evidence. *See, e.g., U.S. v. Pollock*, 402 F. Supp. 1310 (D. Mass. 1975); *U.S. v. Acarino*, 270 F. Supp. 526 (E.D.N.Y. 1967).

In *U.S. v. Gaultney*, 606 F. 2d 540 (5th Cir. 1979), the prosecution refused to provide defendants' chemist with a primary reference sample, of which the quality and purity are known, of the type drug to be tested. The court held that the district court's refusal to order the government to provide defendants with the sample did not place "an unreasonable restriction on the defend-

ant's right to an independent analysis so as to deny him due process of law." *Id.* In reaching its decision, the Court noted that defendants' chemist made no attempt to otherwise examine the evidence to determine whether he could make an independent analysis of its contents.

Relying on this line of cases, we hold that due process requires that defendants have the opportunity to have an independent chemical analysis performed upon the seized substances. Here, the court's refusal to allow defendants further access to the drugs did not violate that due process requirement. Defendants had two months between the time of the order and the date of the trial to engage a chemist and set up a meeting; as the trial court noted, the confusion probably could have been avoided had defendants not sat so long upon their right to have an expert examine the drugs. There was ample evidence that defendants' chemist never intended to conduct an independent analysis of the drugs, and he certainly did not avail himself of the opportunity to do so that evening. In addition, defendants' theory of the inaccuracy of the State's tests was adequately brought out during cross-examination. We therefore find no error in the trial court's refusal to allow defendants' chemist further access to the seized substances.

### Defendant Gerald Jones' Appeal

At the outset, we note that defendant Gerald Jones limited his argument at trial to the theory that the State could not prove beyond a reasonable doubt that the drugs were in fact hydromorphone or that, alternatively, the drugs were not present in the amounts necessary for conviction. In his opening argument to the jury, counsel for defendant stated as follows:

> Now, during the trial, certain evidence will be presented by the State to show possession and sale of drugs, the drug Dilaudid allegedly containing hydromorphone. Gerald Jones, the defendant, is not contesting most of those facts. We have even offered to stipulate to some of those facts so that the State will not have to put up witnesses on the stand to show these transactions. That's not the issue in this trial for Gerald Walter Jones, although there may be some transactions that occurred because of what the defendant will allege

as trickery, deception, or other things that the government agent did.

The issue in the trial is whether or not the State can prove beyond a reasonable doubt that the drugs were, in fact, hydromorphone, and that the amounts claimed were, in fact, in some cases in excess of 28 grams, in other cases the substances as charged by the judge.

These statements constitute an admission that defendant Gerald Jones engaged in the drug transactions for which he stands accused. Defendant is therefore limited on appeal to those issues which he did not concede at trial. Accordingly, we overrule defendant's assignment of error regarding the court's refusal to examine the PEN register records.

[3] We first address defendant's assignments of error concerning the testimony of Dr. Charles McDonald. Dr. McDonald was a chemist of the S.B.I. laboratory in Swannanoa. A few months before trial, authorities discovered that Dr. McDonald had taken some $300,000 worth of drugs from the laboratory. At a pretrial hearing, presiding Judge Charles Lamm heard testimony from Dr. McDonald; however, on most questions, McDonald took the fifth amendment. Defendant made a motion for disclosure of Dr. McDonald's personnel file, that the prosecution be required to bring charges against Dr. McDonald or that Dr. McDonald be granted immunity in order to testify in the case against Gerald Jones. These motions were denied. Defendant also requested that the prosecution disclose the investigation file on Dr. McDonald; the court reviewed the material and refused the request, concluding that nothing in the file was relevant to the charges against Mr. Jones. Defendant contends that the trial court erred (1) in failing to dismiss the indictments because the State refused to grant Dr. McDonald immunity, and (2) in failing to instruct the jury that the testimony of a missing or absent witness who is peculiarly within the State's power to produce would have been unfavorable to the State's case. We disagree. Having reviewed the evidence before us, including McDonald's personnel file which the trial court sealed for review on appeal, we find that McDonald's testimony would be neither relevant nor exculpatory to the defendant. Accordingly, these assignments are overruled.

**[4]** Defendant's next assignment of error concerns his conviction for trafficking in hydromorphone. On the basis of defendant's possession and attempt to sell 816 tablets of Dilaudid with a total weight of 73.5 grams, defendant was convicted of trafficking in hydromorphone in an amount in excess of 28 grams. No measurement was made of the percentage of hydromorphone actually present in the Dilaudid tablets. Defendant contends that the North Carolina and United States Constitutions require that the weight of the hydromorphone contained in the tablets be used in the computation rather than the total weight of the tablets themselves. We disagree.

G.S. § 90-90 lists Schedule II controlled substances. Included in the section are opium and its derivatives, of which hydromorphone is one. G.S. § 90-90(a)(1)(xi). G.S. § 90-95(h)(4)(c) provides that, where any person "sells, manufactures, delivers, transports or possesses" four grams or more of opium or opium derivative "or any mixture containing such substance," he shall be guilty of the felony of "trafficking in opium or heroin" and, where the substance or mixture involved:

(c) Is 28 grams or more, such person shall be punished as a Class C felon and shall be sentenced to a term of at least 45 years in the State's prison and shall be fined not less than five hundred thousand dollars ($500,000).

Clearly, the legislature's use of the word "mixture" establishes that the total weight of the dosage units of Dilaudid is sufficient basis to charge a suspect with trafficking. This interpretation has been held to be constitutional under Article I § 19 of the North Carolina Constitution and the due process and equal protection clauses of the United States Constitution. *State v. Perry*, 316 N.C. 87, 340 S.E. 2d 450 (1986); *State v. Willis*, 61 N.C. App. 23, 300 S.E. 2d 420, *modified and affirmed*, 309 N.C. 451, 306 S.E. 2d 779 (1983). These cases, which concerned trafficking in heroin, also a Schedule II substance, are clearly analogous to the one at bar; evidence at trial indicated that hydromorphone is used as by addicts as a substitute for heroin. Accordingly, this assignment is overruled.

**[5]** Defendant asserts that the trial court erred in denying his motion to dismiss one of the sale and delivery indictments against him. He contends that the grand jury could not have returned a

valid true bill on that charge because the laboratory report was not prepared until after the grand jury convened. We disagree.

The nature and character of the evidence presented to the grand jury is by statute secret. *See* G.S. § 15A-623(e). It is against the public policy of this State to allow a defendant to expose the nature of the evidence upon which a true bill was returned; for this reason a defendant is not allowed to cross-examine the witnesses before a grand jury. *State v. Phillips*, 297 N.C. 600, 256 S.E. 2d 212 (1979). The defendant is "adequately protected by his right to object to improper evidence and cross-examine the witnesses presented against him at trial." *State v. Porter*, 303 N.C. 680, 281 S.E. 2d 377 (1981). Accordingly, this assignment is overruled.

In his final assignment of error, defendant contends that the rulings of the trial court and the conduct of the proceedings below became so tainted with prejudice that the cumulative effect denied defendant the following: a fair trial, due process, equal protection, effective assistance of counsel, the right of confrontation, and the right to present evidence in his defense. However, in reviewing defendant's exceptions and the transcript taken as a whole, we find no support for defendant's scattered-shot proposition. This assignment is overruled.

The results are:

As to defendant Willie Kate Jones, a new trial as to charge 85CRS10009, conspiracy to sell and deliver a controlled substance, hydromorphone. As to all other charges, no error.

As to defendant Gerald Walter Jones, no error.

Judges EAGLES and GREENE concur.